# United States District Court
## Northern District of Indiana
## Hammond Division

ESTATE OF CEDELL WRIGHT,    )
    )
      Plaintiff,    )
    )
      v.    )      Civil Action No. 2:13-CV-333  JVB
    )
LAKE COUNTY, IN et al.,    )
    )
      Defendants.    )

## OPINION AND ORDER

Plaintiff, the estate of Cedell Wright, has sued Defendant Dr. William Forgey under 42 U.S.C. § 1983, alleging that his deliberate indifference to Wright's serious medical needs while he was a pretrial detainee at the Lake County jail resulted in Wright's death. This matter is before the Court on Dr. Forgey's motion for summary judgment (DE 125) and motion to strike certain evidence Plaintiff has offered in opposition to the summary judgment motion (DE 150).

## A.     Facts

The following facts are taken as true for the purposes of Dr. Forgey's motion.  They are taken largely from Dr. Forgey's Statement of Undisputed Material Facts (because Plaintiff, in its response to the motion, does not challenge any of those facts or identify, in its Statement of Genuine Disputes any facts it contends are genuinely disputed) and augmented by facts set out in the "Facts" section of Plaintiff's brief.

Dr. Forgey is a physician affiliated with Correctional Health Indiana Inc., an Indiana corporation that has contracted to provide health services to inmates at the Lake County Jail.  He

is not an employee of the Lake County Jail or the Sheriff of Lake County, but serves as the Jail's medical director. He held that position when Cedell Wright, was a pretrial detainee at the Jail from November 9, 2012, to March 4, 2013, the day he died. Although Dr. Forgey stated in his affidavit that he was not responsible for supervising or administering mental health services at the jail, he had a collaborative practice agreement with Faith Ornelas, a Clinical Nurse Specialist, that called for Dr. Forgey to work with Ornelas to provide health care services to patients of the Lake County Jail, including providing psychiatric medication prescriptions and counseling.

Wright's jail medical records indicate that he was 5'10" tall and weighted 134 lbs when he arrived at the Jail. According to a mental health/suicide intake screening, Wright reported that he had nothing to look forward to and felt that there was no help for him and his situation. A mental health evaluation was attempted on November 20, 2012, but Wright signed a mental health refusal of care form. Additional attempts at mental health screenings were not successful. On November 20, 2012, Wright also refused a comprehensive health screening.

On November 30, 2012, Wright reported that he had been constipated for two weeks and that constipation was a recurring problem for him. He also reported a loose tooth and severe pain from the four teeth adjacent to the loose tooth. He was described as thin and emaciated. He refused the mineral oil that was prescribed for his constipation. He was given a dental appointment and scheduled for a clinic visit that he refused. Mr. Wright was ordered to see Dr. Forgey or a nurse practitioner in five days.

On December 3, 2012, Wright refused to come to the clinic. On December 4, he refused a lab draw. On December 7, he refused dental treatment. Dr. Forgey saw him on December 9,

when he noted that Wright was prescribed multiple vitamins due to his emaciated condition, but refused them.

On December 10, 2012, Wright refused dental care and complained of constipation and abdominal pain. He was given mineral oil. That evening he made an urgent care call, reporting that he had not had a bowel movement in four weeks, had abdominal pain, and had spit up blood. A nurse practitioner's assessment was constipation with impaction and abdominal pain. Wright was insisting on a stool softener, but she told him it could not be given until the impaction cleared. Wright did not want the impaction manually cleared and agreed to try a suppository first. He was to see the nurse practitioner two days later, but on December 13, 2012, he refused a clinic visit.

On December 18, 2012, Wright again complained of abdominal pain and constipation. His abdomen was slightly distended but it was not painful upon touch. He was given a dose of mineral oil and was scheduled to have a clinic visit on December 20. On that date, Wright was evaluated by Dr. Jose Agusti regarding abdominal pain, constipation, and diarrhea.

On January 12, 2013, Wright lost a tooth and complained of a sharp ache in his left ear. Dr. Forgey was called and he ordered an antibiotic and pain medication for ten days, as well as a dental visit. However, Wright did not take these medications as directed.

On January 14, 2013, Wright was seen by a mental health worker (at least the Court believes the initials after her name—QMPH—stand for "qualified mental health provider") after it was reported that he was not integrating with the general population, was not eating, was losing weight and had not showered in five days. The mental health worker described him as emaciated, flat, and irritable. He avoided eye contact and his speech was slow, soft, and slurred.

Wright told her that he would refuse "psych" medications because he had never taken any medications in his life. He appeared lethargic, withdrawn, and depressed. He was moved to the medical wing on the fourth floor for medication, observation, and stabilization.

The Jail medical records document that the mental health staff evaluated him on January 15, 17, 18, 21, and 22. It was noted that he was refusing to eat because he did not like jail food. A nurse practitioner discussed the importance of calorie intake to ensure immune system strength and stated that the plan was to consult with the medical director and consider Megace (an appetite stimulant). Wright said he would try to eat more. He was also told that mental health services were available if he wanted to talk to a mental health worker. On January 22 he reported experiencing auditory hallucinations that he did not find particularly distressing and had a depressive demeanor. His weight was recorded as 126.8 pounds. The importance of eating was again discussed. The plan was to start him on Risperdal and Cogentin.

On January 22, Mr. Wright met with his criminal attorney, Derrick Julkes. Julkes was shocked to see how emaciated Mr. Wright had become while in custody. Julkes feared that if Wright's condition deteriorated further, he would die. Julkes spoke with the deputy warden and sent a letter to several Jail officials.

On January 28, 2013, Dr. Agusti saw Wright. He weighed 128 pounds, reported no complaints, and told Dr. Agusti that he had always been slim and was doing fine. Dr. Agusti noted rales in his lungs and that Wright wasn't eating well and refused to have labs drawn and refused medication. Dr. Agusti diagnosed cachexia.[1]

---

[1]Neither party took the trouble to define this term in their briefs or affidavits. Scouring the record, as the Court is not required to do, it discovered an incomprehensible definition in the expert report of David Thomas, one of Plaintiff's experts: "Cachexia is weight loss is [sic] due to the break-down of protein (catabolism) which is due to the increased metabolic rate as a result of cytokines released by immune cells and proteolytic enzymes which break

Later that day, Nurse Ornelas did a psychiatric evaluation of Wright. According to the evaluation, he was actively hallucinating and had a history of auditory and visual hallucinations. Wright told Ornelas that he would continue to decline medications. She diagnosed him as having schizoaffective disorder. Risperdal and Cogentin were discontinued because Wright refused to take them.

Wright refused a mental health evaluation on February 4, 2013. On February 5, a nurse practitioner evaluated him because he was refusing to eat and claimed he could not hear. He now weighed 125 pounds. It was determined that his body-mass index was less than eighteen and he had hearing loss in both ears because of thick ear wax plugs. He was prescribed ear drops. He was also evaluated by the mental health staff. The mental health worker met with someone on the medical staff. Once again, the plan was to consult with Dr. Forgey and consider Megace for Wright.

The jail medical records from February 6 through 9 document Wright's refusal to take various prescribed medications including ear drops, a flu immunization, and Tamiflu. The latter medications were prescribed because Mr. Wright had been exposed to an inmate who had died of Influenza B.

On February 11, 2013, an urgent care assessment was performed because Wright had been complaining of diarrhea for 24 hours and told the medical staff person that he was too weak to clean himself or get up to go to the bathroom. Dr. Forgey instructed the Jail officers to have Wright washed and prescribed Imodium. He was scheduled to be seen in clinic the following

down protein." (DE 144-17 at 21.)   Resorting to the dictionary, the best definition the Court could find is that cachexia is a general physical wasting and malnutrition usually associated with chronic disease. Https://www.merriam-webster.com/dictionary/cachexia.

day but refused to go.  He was placed on respiratory isolation for refusing treatment for Influenza B.  He was again scheduled for a clinic visit for February 18 for exposure to Influenza B but again refused to go.

On February 19, 2014, the mental health staff evaluated Wright again.  His only complaint was soiled pants.  The mental health worker discussed the problem with Jail officers who said they would get him new pants.  The mental health worker's plan was to continue current treatment and follow up as needed.

On February 28, 2013, Dr. Agusti evaluated Wright.  His charting indicates that Wright's lungs were clear, that his skin was warm and dry and had good color, that his abdomen was soft, not tender, and that he had positive bowel sounds in all four quadrants.   He described Wright as being in mild pain or distress.

On March 3, 2013, Dianna Reed, a medical assistant, came to see Wright because Jail officers reported that he was curled up in a fetal position with covers over his head.  She documented some vital signs and reported that he was alert and oriented.

At 7:23 on the morning of March 3, Wright was found unresponsive in his cell.  Among others, Dr. Agusti was on the scene.  CPR was started and advanced cardiac life support protocol was followed.  He was shocked and an endotracheal tube was inserted.  Wright was transported to Methodist Hospital, where he was pronounced dead at 8:22 am.

Dr. John Cavanaugh performed an autopsy on Wright on March 5.  He found the cause of death to be lobar type pneumonia that he said had been present for days, with fecal impaction a contributing factor.  However, Dr. Forgey disagrees with Dr. Cavanaugh's conclusions. He believes Wright had heart trouble and went into cardiac arrest, that after he was intubated the

tube became dislodged, and that he died from lack of oxygen after cardiac arrest. He believes that the dislodged tubing could have caused post-death congestion and trauma to the lungs that Dr. Cavanaugh saw as pneumonia.

**B.      Plaintiff's Experts' Opinions**

According to Dr. David L. Thomas's affidavit submitted by Plaintiff in opposition to summary judgment, Wright's Jail medical records show a continual worsening of his physical condition and mental health.  Such a decline can be reversed by undertaking aggressive mental and physical health measures, which Dr. Forgey did not order.  Dr. Thomas further opines that Wright was clearly a danger to himself:  he was acutely psychotic and caused harm to himself by refusing medications and food.  Little attention was paid to Mr. Wright's diagnosis of cachexia when the treating physicians should have ordered a work-up to determine its underlying cause. In Dr. Thomas's view, Dr. Forgey should have intervened with forced medication.

Dr. Cheryl Wills opines in her affidavit that Wright's mental disorder was sufficiently severe to meet criteria for involuntary hospitalization and that those responsible for providing mental health services at the Jail were grossly unresponsive to his needs.

**C.      Discussion**

**(1)      *The Motion to Strike***

Dr. Forgey seeks to strike paragraphs 14, 19, 21, and 22 of the Thomas affidavit. However, his brief in support of the motion is confusing.  He purports to quote from paragraph 14 but the allegedly objectionable language ("A review of the medial [sic] records shows that

Forgey turned a blind eye to Mr. Wrights serious medical needs by ignoring his deteriorating mental health state") appears nowhere in that paragraph, or anywhere else in his affidavit that the Court can find, although somewhat similar language can be found in paragraph 19. Accordingly, paragraph 14 will not be stricken.

As to paragraph 19, Dr. Forgey objects to Dr. Thomas's opinion that the care provided to Wright fell well below the applicable standard of care. The objected-to language in paragraph 21 is Dr. Thomas's opinion that the Jail health care providers "tripped the threshold of deliberate indifference by documenting Mr. Wright's regular and complete downward spiral." (DE 144-17 at 5.) Dr. Forgey seeks to strike the following language from paragraph 22: "While in the custody of the Lake County Jail, the jail health care providers failed to take appropriate actions to provide treatment for Mr. Wright and as a proximate result are responsible for his death." (*Id.*) He insists that these opinions amount to impermissible legal conclusions.

Dr. Forgey also objects to certain language in paragraph 9 of Dr Cheryl Wills's affidavit. He claims that her opinion that "those responsible for providing appropriate mental health services to inmates were grossly unresponsive to Mr. Wright's need for mental health services" and "[t]he breach in the Jail Management's fiduciary obligation to provide competent psychiatric services to Mr. Wright resulted in his severe physical and emotional pain, suffering, disability and death." (DE144-15 at 3.)

The ultimate legal question that must be answered in this case is whether Dr. Forgey's conduct amounted to deliberate indifference to Wright's serious medical needs. Federal Rule of Evidence 704(a) provides that an opinion is not objectionable just because it embraces an ultimate issue. However, experts are not permitted to testify as to their legal conclusions. *Good*

*Shepherd Found. v. Momence*, 323 F.3d 557, 564 (7th Cir.2003). Accordingly, the Court will strike Dr. Thomas's legal conclusion in paragraph 21 that the Jail health care providers' conduct toward Wright amounted to deliberate indifference. The other opinions Forgey has objected to are not legal conclusions, and will not be stricken.

**(2)**      ***The Motion for Summary Judgment***

Dr. Forgey maintains that he is entitled to qualified immunity, but even if that defense does not apply to him as the employee of a private medical provider, there is no genuine issue as to whether Dr. Forgey acted with deliberate indifference to Wright's medical needs.

On the qualified immunity issue, the Seventh Circuit's very recent opinion in *Estate of Clark v. Walker*, Nos. 16-3560 & 16-3644, 2017 WL 3165632, at \*4 (7th Cir. July 26, 2017) made it clear that a private doctor working for a public institution is not entitled to the protection of qualified immunity. Dr. Forgey is a private doctor working for a corporation that has a contract with the Lake County Jail. As such, the defense of qualified immunity is not available to him.

Summary judgment is appropriate only if, construing the record in the light most favorable to the nonmoving party, no jury could reasonably find in favor of that party. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016). Thus, with qualified immunity out of the case, the only issue is whether there is evidence from which a reasonable jury could conclude that Dr. Forgey was deliberately indifferent to Wright's serious medical needs. While this is an unusual case, there is evidence from which a jury could reach that conclusion.

A defendant is deliberately indifferent to a prisoner's medical needs if he knows of and

disregards an excessive risk to his health. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The medical records in this case show a patient who repeatedly refused medication and treatment against his own interest, who would not eat, whose appearance was described as emaciated, and who suffered from serious mental illness. While numerous different healthcare providers saw Wright and evaluated him during his incarceration, very little treatment occurred because of his refusals. Meanwhile his mental and physical health steadily declined. A jury could find that Dr. Forgey knew from Wright's medical records documenting his weight loss and refusal of medications that he was a danger to himself and that more aggressive measures such as forced medication, a psychiatric referral, and forced nutrition should have been considered. Instead, the medical staff did little more than chart his downward spiral.

Dr. Forgey's handling of Wright's treatment is in marked contrast to the conduct of Dr. Rohrer, a defendant in *Rice v. Correctional Medical Services*, 675 F.3d 650 (7th Cir. 2012), which the Seventh Circuit viewed as a close case. *Id.* at 685. In that case, the court held that Dr. Rohrer could not be found to have been deliberately indifferent to inmate Rice's needs when three times during his incarceration Dr. Rohrer petitioned an Indiana state court to involuntarily commit Rice after he refused psychotropic medication, refused to eat, refused to communicate, and had a diagnosis of schizophrenia. *Id.* at 684–85.

Dr. Forgey maintains that he was not responsible for supervising or administering mental health services at the Jail, but the existence of the collaborative practice agreement he had with Nurse Ornelas creates a question of fact as to what his responsibility for Wright's mental health was.

**D.      Conclusion**

For the foregoing reasons, Dr. Forgey's motion to strike (DE 150) is GRANTED IN

PART and DENIED IN PART.  His motion for summary judgment (DE 125) is DENIED.


SO ORDERED on September 6, 2017.

 s/ Joseph S. Van Bokkelen 
Joseph S. Van Bokkelen
United States District Judge
